[Civ. No. 22120.   Second Dist., Div. One.   Aug. 12, 1957.]

ARTHUR LOOFF, Respondent, v. CITY OF LONG BEACH et al., Appellants.

[Civ. No. 22121.   Second Dist., Div. One.   Aug. 12, 1957.]

FARMERS AND MERCHANTS TRUST COMPANY OF LONG BEACH, as Trustee, etc., et al., Respondents, v. CITY OF LONG BEACH et al., Appellants.

Walhfred Jacobson, City Attorney, Philip J. Brady and John R. Nimocks, Deputy City Attorneys, for Appellants.

Ball, Hunt & Hart, Madden & McCarry and Ramsey & Emlein for Respondents.

FOURT, J.—These actions were brought by the operators of certain amusement games in the city of Long Beach, together with the landlord of certain of them, to restrain the

*Assigned by Chairman of Judicial Council.

enforcement of a newly adopted ordinance, No. C-3496*, purporting to regulate all games conducted or played in the city of Long Beach. The actions by stipulation were consolidated for trial. From a judgment in each action declaring the ordinance unconstitutional, void and unenforceable, and granting an injunction permanently restraining its enforcement, the defendants have appealed.

The ordinance in question created an Amusement Games Appeal Board as an official body of the city. For the purposes of the ordinance a "Game of Skill and Science" was defined as "any game participated in by one or more players for any prize, gift or award of anything of value where or when any charge is made by the person conducting, operating or maintaining such game, or any consideration is paid by any player for the right to play or participate in any such game, and the dominating factor in determining the result of such game is dependent upon the skill of the player or players and not upon chance; provided, that in any case where the result of such game may be dependent to some extent upon the judgment, intelligence or adroitness of the player, but nevertheless the dominating factor in determining the result of such game is chance, such a game shall not be considered as a game of skill and science, but shall be considered as a game of chance." A "Game" is defined in the ordinance as "any game participated in by one or more players for any prize, gift or award of anything of value where or when any charge is made by the person conducting, operating or maintaining such game, or any consideration is paid by any player for the right to play or participate in any such game."

The provisions of the ordinance which are pertinent to these appeals are as follows:

"Sec. 4. PERMIT REQUIRED—EXCEPTIONS. No person shall operate, maintain, conduct, carry on or permit, suffer or allow the operation, maintenance, conduct or carrying on of any game unless such person is the holder of a valid and unexpired permit issued by the Board under the provisions of this ordinance, except that the Council does hereby find and determine that the following games, as ordinarily played at

---

*At the time of trial, the provisions of Ordinance No. C-3496 had been codified and designated as Sections 6260-6260.15 of the Long Beach Municipal Code.

the time hereof, are games in which chance does not predomi-
nate in determining the result thereof, and that as to the
following games no permit shall be required:

Aquaplaning
Archery
Auto racing
Badminton
Baseball
Basketball
Batball
Billiards
Bowling, Indoor
Bowling-on-the-green
Boxing
Box hockey
Cage ball
Captain ball
Crew rowing
Cricket
Clock golf
Curling
Diving
Paddle tennis
Pingpong
Polo
Pool
Quoits
Roque
Regattas
Scooter racing
Sailing
Skating
Skiing
Shuffleboard
Squash
Swimming
Soccer
Softball
Speedball
Table tennis
Track events
Trap shooting
Tennis
Tetherball
Touch football
Volley ball
Wrestling
Yachting

Dodge ball
Fencing
Football
Field events
Fishing
Fly casting
Golf
Handball
Hockey
Horseshoes
Kickball
Kite flying
Lacrosse
Longball
Marbles
Model aircraft flying
Model boat sailing
Motorboating
Motorcycling
Bridge
Canasta
Cassino
Cinch
Cribbage
Euchre
Five Hundred
Gin Rummy
Hearts
Pinochle
Pitch
Rum
Whist

Backgammon
Checkers
Chess
Crokinole
Dominoes
Monopoly
Parchesi

"No permit shall be required under the terms of this ordinance for the carrying on of any game for which a permit is required under the provisions of any other ordinance of the City."

"Sec. 6. REPORT AND RECOMMENDATION BY CHIEF OF POLICE —APPEAL. Upon receipt of such application [for a permit], properly completed, the Secretary shall immediately refer such application to the Chief of Police. Within thirty days, the Chief of Police shall investigate all matters and persons covered in the application and report to the Board thereon. His report shall cover the matters specified in Section 7 hereof and shall contain his specific recommendation on each issue as to whether or not a a permit should be granted. If his recommendation is favorable, the Secretary shall issue the permit in the name of the Board under such rules and regulations thereof as the Board shall adopt. If the report or recommendation of the Chief of Police is adverse to the applicant, he shall serve a copy thereof on the applicant. Within seven days of service of such notice on the applicant, he may file notice of appeal with the Board. If no such notice is filed with the Board within such time, the recommendation of the Chief of Police shall be deemed to have been adopted by the Board and the application for the permit deemed denied."

"Sec. 7. ISSUES ON APPEAL. Upon receipt of such appeal, the Board shall set the appeal upon its calendar for hearing at the earliest practicable date and notify the applicant of the hearing at least five days prior to the time thereof. At the hearing, the issues shall be confined to the following:.

"(a) Whether each applicant is of good moral character and repute;

"(b) Whether the dominating factor in determining the result of such game is chance or skill and/or science in accordance with Section 3 hereof;

"(c) Whether such game is prohibited by any law of the State or City.

"If the decision of the Board on any of these questions is adverse to any applicant, the application for a permit shall be denied."

"Sec. 9. PERMITS—CONDITIONS. Any permit issued under the provisions of this section shall be issued only to the person named in the application and shall not be assignable or transferable; subject to other provisions of this ordinance, such

permit shall be valid until revoked or suspended and shall be issued upon and subject to the following conditions:

"(a) That permittee will not permit, suffer or allow the game authorized to be played in any manner other than the manner described in detail in the application;

"(b) That no equipment, apparatus, device, material or contrivance of any kind be used in the conduct of or playing of such game that is not described or referred to in the application."

"Sec. 10. CHANGE OF OWNERSHIP. If there is a change of ownership of a game for which a permit is required hereunder, a new permit shall be required. Change of ownership for the purposes hereof shall be defined as any one of the following:

"(1) In case of a partnership, a change in partnership personnel by the addition or substitution of a new partner;

"(2) In case of a corporation, a change in ownership of more than fifty per cent (50%) of the stock outstanding or beneficial interest in such corporation, the new owners being persons other than those named in the original application;

"(3) In any case a change in the personnel of the managing officers of such corporation or in the persons responsible for the management of such game."

"Sec. 11. SUSPENSION AND REVOCATION OF PERMITS.

"(A) If the permittee or any agent, employee or servant of permittee acting for and on behalf of such permittee in connection with the operation, maintenance or conduct of any game, is convicted in any court of competent jurisdiction in the State of California, of having violated any law of the State of California prohibiting or regulating gaming or of having violated any of the provisions of this ordinance or any ordinance of the City prohibiting or regulating gaming, all permits theretofore issued to such permittee shall be revoked by the Board forthwith upon the filing of a certified copy of final judgment of conviction of the court with the Board without hearing or previous notice.

"(B) The Chief of Police may suspend any permit issued hereunder pending the holding of a public hearing as provided in Subsection 11(C), by causing a written notice of such temporary suspension to be served on permittee. The action of the Chief shall be passed upon by the Board at its next regular meeting, at which time the Board shall continue the suspension in effect and order a public hearing thereon, or dissolve the order of suspension.

"(C)  No permit shall be issued hereunder, and any permit issued hereunder shall be revoked or suspended, if any of the following conditions exist or occur, to wit:

"(1)  That applicant for permit or the holder of any permit, as the case may be, has knowingly made any material misstatement in his application for permit;

"(2)  That the holder of any permit has violated any of the provisions of this ordinance;

"(3)  Any condition then exists which would have been grounds for denial of the permit.

"No permit shall be revoked for any cause, except as specified in Subsection 11(A), until a public hearing has been held thereon, of which hearing permittee has been given at least five days' notice.  Such notice shall specify the grounds upon which revocation is proposed.  Hearing shall be had on the grounds therein specified."

Respondents concede, and there is no question but that the city in the exercise of its police power may enact legislation regulating amusement enterprises.  It is alleged in respondents' complaints, and it was their main contention during the trial, that the ordinance is void in that it is discriminatory; that the classification of games is arbitrary, unreasonable and capricious.

As stated in *Franchise Motor Freight Assn.* v. *Seavey,* 196 Cal. 77, 81 [235 P. 1000]:  "It is well settled that the authority and duty to ascertain the facts which will justify classified legislation rests in the first instance with the legislature.  Every presumption is in favor of the validity of the legislative determination, and its decision as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary (*Anastasion* [*Martin*] v. *Superior Court,* 194 Cal. 93 [227 P. 762] ; *People* v. *Monterey Fish Products Co.,* 195 Cal. 548 [234 P. 398, 38 A.L.R. 1186] ).  It is equally well settled that a statute makes an improper and unlawful discrimination if it confers particular privileges upon a class arbitrarily selected from a larger number of persons all of whom stand in the same relation to the privileges granted and between whom and the persons not so favored no reasonable distinction or substantial difference can be found justifying the inclusion of the one and the exclusion of the other (5 Cal.Jur. 825, and cases cited)."

The classification by the Legislature "must not be arbitrarily made for the mere purpose of classification, but

must be based upon some distinction, natural, intrinsic, or constitutional, which suggests a reason for and justifies the particular legislation. That is to say, not only must the class itself be germane to the purpose of the law but the individual components of the class must be characterized by some substantial qualities or attributes which suggest the need for and the propriety of the legislation. Subject to these limitations a law is general despite the fact that it operates only upon a class of individuals or things, if it applies equally to all persons or things within the class to which it is addressed.'' (*Martin* v. *Superior Court*, 194 Cal. 93, 100-101 [227 P. 762] ; see also *Ex parte Sohncke*, 148 Cal. 262, 267 [82 P. 956, 113 Am.St.Rep. 236, 7 Ann.Cas. 475, 2 L.R.A.N.S. 813] ; *In re Fassett*, 21 Cal.App.2d 557, 560 [69 P.2d 865] ; *Morganti* v. *Morganti*, 99 Cal.App.2d 512, 516 [222 P.2d 78].)

Appellants assert that the trial court erred in taking evidence, over their objections, as to the nature and operation of the games conducted by Mr. McLain and Mr. Turner. Section 4 of the ordinance provides in substance that no person shall operate or maintain any game unless (1) such person is the holder of a permit issued by the Amusement Games Appeal Board, or (2) such game is one of the 84 games classified as being exempt from the application of the ordinance and for which no permit is required. Neither of the games operated by Mr. McLain and Mr. Turner were included in the list of exempt games. The evidence in question was offered, and it was properly received, as bearing upon the question of whether in excluding certain games from the application of the statute there was an unreasonable discrimination.

According to the evidence, Mr. McLain conducted a balloon-dart concession which is operated in the following manner: Six or eight players stand at a counter approximately 2 feet wide and 18 feet long. Parallel to the counter, and 10 feet distant, is a back board about 6 feet high, on which there are fastened various inflated balloons. The operator of the concession furnishes the players with darts approximately six and one-half inches long, with a needle point at the end. The body of the dart is made of wood with feathers in the back, the same as on an arrow. The players hold the dart between thumb and forefinger and throw them at the balloon targets, the object of the game being to prick the balloons with the darts. The more balloons broken, the higher the player's score and the more valuable is the prize won. The back board is made of plain celotex, perpendicular

to the floor, with no slant; the balloons are fastened in a straight line. The darts are purchased from a manufacturer and nothing is done to change their weight or flight. Proficiency in throwing the darts depends upon the same factors as go to make a person more accurate in rifle shooting or shooting a bow and arrow.

Mr. Turner operated a knife-throwing concession, in which game standard Malayan throwing knives are thrown at a target consisting of playing cards fastened to a wooden back board.

Near the concessions of Mr. McLain and Mr. Turner, games of archery, baseball, basketball and quoits are conducted. These games are all included in the exempt list in section 4 of the ordinance and no permits are required for their operation. In the archery game, players obtain 10 arrows for a quarter and shoot at a straw target in which the bull's eye is a balloon. The same factors develop proficiency in both the archery and the dart and knife games,—stance, muscular control and eye control. In the baseball game, a mechanical device pitches a baseball toward the player, who attempts to bat the ball into various levels, which determine his score. A cash prize is awarded for high scoring. The skill in the baseball game can be built up by improving muscular and eye coordination, as in the balloon-dart and knife-throwing games. In the basketball concession a regulation basketball is suspended from a back board. The player stands on a line approximately 20 feet away and attempts to throw a basketball through the basket. A charge of 25 cents is made for each try. The game of quoits is played by throwing the quoits, a certain number of which are obtained for a set fee, over blocks. Prizes are offered, sometimes consisting of money, to those successful in ringing the blocks. Proficiency in the game is developed by practice, as in dart throwing or knife throwing.

It thus appears obvious from the evidence that the same factors develop skill in Mr. McLain's balloon-dart game, Mr. Turner's knife-throwing game and the exempt games of archery, baseball, basketball and quoits, these latter games being excluded from the application of the ordinance since they are specifically found to be ''games in which chance does not predominate in determining the result thereof.'' Fundamentally these games are the same. ■ A classification which rests upon no reasonable basis and which bears no substantial relation to a legitimate purpose to be accomplished is

purely arbitrary and patently discriminatory. ▆▆▆ We find no reasonable distinction or substantial difference justifying the classification in section 4 of the ordinance.

It is also noted that the games of monopoly, backgammon and parchesi, the sets and rules of which were introduced into evidence, are also excluded from the application of the ordinance. Although in each of these games the moves are all determined by the throw of the dice, these games are likewise among those exempt under section 4 as being games in which chance does not predominate.

▆▆▆ That the ordinance is discriminative in its operation is readily apparent upon its face. Section 5 requires a verified application to be filed by all parties interested in the application. This section and section 9, require an undertaking that the applicant will not allow the game to be played or operated in any other manner than that described in the application and further require an undertaking that no other equipment, apparatus or device than that described will be used. Therefore, if the operator of an amusement game discovers that the players are becoming too skillful he cannot make such changes as distance from the throwing line to the target, or the size of the target, or the number of points required to win the game, or establish a handicap, which, according to the evidence, the operator of a skill game frequently does. On the other hand, there is no prohibition against games exempted at the time of the adoption of the ordinance from at any time in the future changing their method of playing, or operation, or their equipment.

Section 6 of the ordinance requires a referral of the application to the chief of police, who is given an investigating period of up to 30 days. Thus, the operator of an exempt game can immediately engage in business while the operator of a nonexempt game must wait through the investigating period of up to 30 days, and possibly through an appeal period before he can engage in business.

Under sections 6 and 7, an applicant for a nonexempt game must establish that he is of good moral character and repute. The owner of an exempt game, such as archery, baseball, basketball or quoits may be possessed of the lowest and most depraved moral character and have an odious reputation and operate his exempt game with impunity.

Under section 10, if a nonexempt game has a change of ownership a new application must be filed, a new investigation made as to the nature of the game and the morals and

repute of the new owner, and a new waiting period suffered. A change of ownership is defined as a change in partnership, a change in ownership of more than 50 per cent of the stock of a corporation, or a change in the personnel of the managing officers of the corporation or in the persons responsible for the management of the game. An exempt game may have a change in ownership or management at will.

Section 11 provides that if the permittee, or any agent, employee or servant of the permittee, acting for him or in his behalf in connection with the operation, maintenance or conduct of any game, is convicted in any court of the state of California of having violated any law of the state of California prohibiting or regulating gaming, or any provision of the ordinance itself, or any ordinance of the city prohibiting gaming, the permit issued for such game shall be revoked by the board forthwith, without hearing or previous notice. The section further provides for the suspension of a permit pending a hearing at the "next regular meeting of the Board," the time for such meetings not being specified or provided for by the ordinance. The owner of an exempt game is subject to no such penalties.

We conclude that the ordinance is invalid in that it is discriminatory and not uniform in its application; that the classification is arbitrary in its nature and not founded upon nor supported by reason.

This brings us to appellants' final contention, that even if the trial court was correct in its holding of an unconstitutional classification, it erred in refusing to give effect to section 17 of the ordinance, which provides as follows: "If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason held to be invalid or unconstitutional by the decision of a court of competent jurisdiction, such decision -shall not affect the validity of the remaining portions of this ordinance. The City Council hereby declares that it would have adopted this ordinance and each section, subsection, sentence, clause, phrase or portion hereof, irrespective of the fact that any one or more sections, subsections, clauses, phrases or portions be declared invalid or unconstitutional."

Appellants assert that the trial court could have stricken the following language from section 4 of the ordinance: ". . . and that as to the following games no permit shall be required." It is appellants' contention that with the fore-

going language eliminated, there would then be no question of an unreasonable or arbitrary classification since the ordinance would apply to all games.

■ As stated in *Morganti* v. *Morganti, supra,* 99 Cal.App. 2d 512, at page 517: "The rule is well established that when part of a statute is declared unconstitutional, the remainder will stand if it is complete in itself and would have been adopted by the Legislature had the latter foreseen the partial invalidation of the statute. (*In re Bell,* 19 Cal.2d 488 [122 P.2d 22] ; 5 Cal.Jur. 644.) "

The obvious purpose of the ordinance in question is to regulate and control games of chance. Other ordinances in effect in the city of Long Beach at the time this ordinance was enacted covered the issuance of licenses to operate amusement games and other businesses. Section 6.100 of Ordinance No. C-3166, adopted in 1952, provided that every person required to pay any license fee should apply to the city tax collector, who was directed to refer the application "to the appropriate departments of the city government in order that it might be ascertained whether or not the business proposed to be conducted or the premises in which it was proposed to locate such business, would comply with applicable laws and ordinances." Under the instant ordinance, applications for permits are referred to the chief of police, whose function it is to determine whether the applicant is of good moral character and repute, whether the dominating factor in determining the result of the game is chance or skill, and whether the game is prohibited by any law of the state or city.

■ Unquestionably, the city council purposely exempted 84 games from the application of the ordinance, even going so far as to specifically find that certain of the games, which are clearly games of chance, are in fact games of skill and science in order to exclude them from the requirements of the ordinance. When the list of excluded games is analyzed and considered in the light of the other provisions of the ordinance, it becomes manifest that the city council did not intend to make such regulations applicable to every game carried on in the city "which is participated in by one or more players for any prize, gift or award or anything of value where or when any charge is made by the person conducting, operating or maintaining such game, or any consideration is paid by any player for the right to play or participate in any such game." We cannot say, therefore, that the city

council would have adopted the legislation had it foreseen the invalidation of that part of section 4 which exempts 84 games from its application.

The judgments are, and each is affirmed.

White, P. J., and Drapeau, J. pro tem.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied October 8, 1957.

*Assigned by Chairman of Judicial Council.